CAROLYN McMATH, Ex'r of the Estate of Kenneth McMath, Deceased, Plaintiff-Appellant, v. RICHARD E. KATHOLI, Defendant-Appellee.

Fourth District   No. 4—98—0404

Argued February 17, 1999.—Opinion filed April 15, 1999.—Rehearing denied May 24, 1999.

COOK, J., dissenting.

Randall A. Wolter (argued), of Wolter, Beeman, Lynch & McIntyre, of Springfield, for appellant.

Karen L. Kendall (argued), of Heyl, Royster, Voelker & Allen, of Peoria, and Frederick P. Velde, of Heyl, Royster, Voelker & Allen, of Springfield, for appellee.

JUSTICE STEIGMANN delivered the opinion of the court:

In February 1994, plaintiff, Carolyn McMath, sued defendant, Dr. Richard E. Katholi, for the wrongful death of her husband, Kenneth McMath. Carolyn alleged that in February 1992, Katholi committed medical malpractice by failing to discover a cardiac emergency that later caused Kenneth's death. In December 1997, the trial court conducted a three-day jury trial, and the jury returned a verdict in Katholi's favor.

Carolyn appeals, claiming that (1) members of the jury improperly discussed the case before the close of evidence, and those discussions led to an improper verdict; (2) the verdict was contrary to the medical testimony; and (3) the trial court abused its discretion by allowing Katholi to testify as an opinion witness although he did not disclose himself in accordance with Supreme Court Rule 213 (166 Ill. 2d R. 213). We reject Carolyn's first two contentions, but we reverse and remand because we agree with her third contention.

## I. BACKGROUND

The evidence presented at trial showed the following. On February 25, 1992, Kenneth began experiencing some chest discomfort. The next day, he visited his friend and primary-care physician, Dr. Edward Ulrich, who wrote a prescription for some indigestion Kenneth was experiencing. Ulrich also recommended that Kenneth see a cardiologist and referred him to Katholi.

The following day, February 27, 1992, Kenneth and Carolyn went from their home in Lincoln, Illinois, to Katholi's office at Prairie Cardiovascular Center (Prairie Cardiovascular), which was located in Springfield, Illinois, in the same building as St. John's Hospital (St. John's), an inpatient hospital that had an emergency room. Katholi was performing an invasive surgical procedure on another patient when Kenneth and Carolyn arrived, but his assistant, Marcey Knowles, contacted him by phone.

Knowles told Katholi that Kenneth had suffered a heart attack in 1984 and had been treated at Prairie Cardiovascular. She relayed the materials in Kenneth's old medical records to Katholi and told him that Kenneth had experienced chest discomfort and indigestion (a symptom of possible heart problems) over the past couple days and

that these symptoms had awakened him at night. However, Kenneth was not experiencing symptoms at the time of the visit.

Katholi could have referred Kenneth to an on-call cardiologist for immediate evaluation or sent him to the emergency room at St. John's if Katholi determined that Kenneth needed immediate attention. Instead, Katholi told Knowles to set up an appointment the next morning for a cardiac catheterization, which is a diagnostic surgical procedure used to determine the degree of blockage in arteries around the heart. Knowles followed these instructions, and the McMaths left to go home.

Approximately 40 minutes later, in their car during the trip home, Kenneth looked down and told Carolyn, "It got dark." He then looked up and said, "I see a light," and started breathing heavily. Carolyn used the car phone to call for help. An ambulance arrived and took Kenneth back to St. John's emergency room, where he was pronounced dead. The emergency room records indicated that Kenneth had a condition called electromechanical dissociation, which occurs when the heart receives a normal electrical signal but nevertheless fails to pump.

In February 1994, Carolyn sued Katholi, alleging that Katholi committed malpractice by failing to conduct an examination of Kenneth or refer Kenneth to another, available doctor prior to sending him home and that this omission resulted in Kenneth's death. In May 1996, in response to the trial court's discovery order, Katholi disclosed Dr. Aldred Heckman, Jr., as his only opinion witness. Katholi never updated this disclosure.

A jury trial proceeded from December 15, 1997, to December 17, 1997. On the first day of trial, Carolyn presented Dr. Ronald Riner, who opined that Katholi had violated the standard of care for a cardiac specialist by failing to have Kenneth evaluated by a colleague or to refer him to the emergency room. Riner also opined that Kenneth had unstable angina, which is a condition whereby the heart muscle is deprived of its blood supply, and that Kenneth's angina caused him to suffer a heart attack during the trip home from Katholi's office.

As part of this testimony, Riner discussed the possible causes of Kenneth's electromechanical dissociation. Riner explained that the death of the heart muscle itself could lead to electromechanical dissociation and that Kenneth's angina could have caused the heart muscle to die.

On the second day of trial, Heckman testified that Katholi did not breach the standard of care for a cardiac specialist. Heckman also discussed the possible causes of electromechanical dissociation. One possible cause was a myocardial infarction, which is the occlusion of one of the arteries providing blood to the heart muscle. Another pos-

sible cause was sudden internal bleeding, which occurs when an aneurysm ruptures. Heckman stated that based on the medical records, he could not conclude what caused Kenneth's death.

On the third day of trial, Carolyn filed a motion captioned "Plaintiff's Third Motion *In Limine*," in which she sought to bar Katholi from testifying on his own behalf regarding the cause of Kenneth's death because Katholi had not disclosed himself as an opinion witness. The trial court denied the motion.

Katholi testified that the electromechanical dissociation noted in the emergency room records was inconsistent with Kenneth's having a heart attack. Accordingly, Katholi opined that Kenneth died from "a complication of his gastroesophageal reflux," which is a gastric condition that commonly causes heartburn. Katholi explained that he believed acid from Kenneth's stomach ate through the junction connecting the esophagus and the stomach, which is located near a major artery. According to Katholi, the acid then ate through this artery, caused massive internal bleeding, and led to Kenneth's electromechanical dissociation and his death.

After the jury returned a general verdict in Katholi's favor, Carolyn filed a posttrial motion, alleging the same errors she raises in this appeal. Attached to her motion was the affidavit of a juror, stating that some jurors had discussed the case and had decided in favor of Katholi before any medical testimony had been presented. The trial court allowed the affidavit into evidence over Katholi's objection but nevertheless denied Carolyn's motion.

This appeal followed.

## II. ANALYSIS

On appeal, Carolyn argues that (1) members of the jury improperly discussed the case before the close of evidence, and those discussions led to an improper verdict; (2) the verdict was contrary to the medical testimony; and (3) the trial court abused its discretion by allowing Katholi to testify as an opinion witness although he did not disclose himself in accordance with Supreme Court Rule 213. We agree only with Carolyn's third argument.

### A. The Juror Affidavit

Relying on a juror affidavit, Carolyn first contends that the verdict resulted from improper jury discussions prior to the close of evidence. The central question is whether Carolyn may impeach the verdict with a juror affidavit. We conclude that she cannot.

As a general rule, testimony of jurors is inadmissible to impeach the jury's verdict. *DiMarco v. City of Chicago*, 278 Ill. App. 3d 318, 326, 662 N.E.2d 525, 531 (1996). In *People v. Holmes*, 69 Ill. 2d 507,

516, 372 N.E.2d 656, 660 (1978), the Supreme Court of Illinois adopted Rule 606(b) of the Federal Rules of Evidence, which contains the only exception to the general prohibition of juror testimony. Rule 606(b) states, in relevant part, as follows:

> "Inquiry into validity of verdict ***. Upon an inquiry into the validity of a verdict ***, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict *** or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes." 28 U.S.C. app. Fed. R. Evid. 606(b) (1994).

(The above-quoted language of Rule 606(b) is slightly different than it was at the time the *Holmes* court adopted it. However, the change of language is nonsubstantive and not relevant to this appeal.)

Under this rule, jurors may testify about their exposure to extraneous information, meaning facts not in evidence and not within the knowledge and observation of the jurors in the affairs of life. However, they may not attempt to explain the effect of that information on the deliberative process. *People v. Hobley*, 182 Ill. 2d 404, 462, 696 N.E.2d 313, 341 (1998); *Waller v. Bagga*, 219 Ill. App. 3d 542, 546, 579 N.E.2d 1073, 1074 (1991), citing *Holmes*, 69 Ill. 2d at 511-12, 372 N.E.2d at 658.

■ The affidavit presented to the trial court in this case did not come within the exception described in *Holmes*. Instead, it contained information pertaining solely to the conduct of jurors and their discussions in the jury room. Irregularities taking place during deliberations do not constitute the type of extraneous influence contemplated by the *Holmes* court. In fact, that court discussed this very issue and wrote the following:

> "[T]here appears to be 'substantial authority' which, while allowing the testimony of a juror as to irregularities occurring outside the jury room, refuses to allow a juror to disclose irregularities which occur in the jury room." *Holmes*, 69 Ill. 2d at 515, 372 N.E.2d at 660.

In *Hobley*, a criminal defendant sought to use juror affidavits to establish that the jury foreperson was a police officer who had shown the other jurors his gun on the first day of the trial and had

intimidated the other jurors into reaching a guilty verdict. *Hobley*, 182 Ill. 2d at 463, 696 N.E.2d at 341. Although the defendant sought to characterize the foreperson's conduct as improper extraneous influence, the supreme court concluded that the juror affidavits pertained only to the deliberative process by which the verdict was reached. *Hobley*, 182 Ill. 2d at 463, 696 N.E.2d at 342.

Our conclusion follows directly from these authorities; the affidavit describing premature jury discussions pertained only to the deliberative process. Although the trial court erred by allowing the juror affidavit into evidence, the court nonetheless correctly rejected Carolyn's contention regarding improper jury discussions.

## B. The Medical Testimony

The material in this section is not to be published pursuant to Supreme Court Rule 23. 166 Ill. 2d R. 23.

## C. Katholi's Undisclosed Opinion Testimony

Finally, Carolyn argues that the trial court abused its discretion by allowing Katholi to opine regarding the cause of Kenneth's death even though Katholi did not disclose himself as an opinion witness in accordance with Supreme Court Rule 213(g). 166 Ill. 2d R. 213(g).

Katholi responds that (1) Carolyn forfeited her claim of error by failing to object at the time Katholi offered his opinion into evidence; and (2) Rule 213 did not require disclosure because Katholi was a party and Carolyn already knew what his opinion would be. We agree with Carolyn.

### 1. Motions *in limine*, Contrasted With Motions To Bar

Katholi first contends that Carolyn forfeited this claim of error because after the trial court denied Carolyn's motion *in limine*, she failed to object at trial. We disagree.

■ Rulings on motions *in limine* are considered interlocutory in nature, and they remain subject to reconsideration at trial. *Chubb/Home Insurance Cos. v. Outboard Marine Corp.*, 238 Ill. App. 3d 558, 567-68, 606 N.E.2d 423, 429 (1992). In fact, trial courts have broad discretion to deny motions *in limine* and choose instead to consider the evidentiary issues raised in such motions only after the contested evidence is offered in the normal course of the trial. *People v. Owen*, 299 Ill. App. 3d 818, 823, 701 N.E.2d 1174, 1178 (1998). Accordingly, the failure to object when the contested evidence is offered generally constitutes forfeiture of the issue, and a pretrial motion *in limine* will not preserve the question for review. *Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.*, 163 Ill. 2d 498, 502,

645 N.E.2d 896, 898 (1994); *Cunningham v. Millers General Insurance Co.*, 227 Ill. App. 3d 201, 204-05, 591 N.E.2d 80, 82-83 (1992).

In *Owen*, 299 Ill. App. 3d at 823, 701 N.E.2d at 1178, we discussed the interlocutory setting in which motions *in limine* arise as follows:

> "One difficulty common to all motions *in limine* is that they occur—by definition—out of the normal trial context, and resolving such a motion requires the trial court to determine what that context will be. Thus, the court must receive offers of proof consisting either of live testimony or counsel's representations that the court finds sufficiently credible and reliable. Because a motion *in limine* typically asks the court to bar certain evidence, the supreme court has deemed such motions 'powerful weapons' and has urged caution in their use. *Reidelberger v. Highland Body Shop, Inc.*, 83 Ill. 2d 545, 550, 416 N.E.2d 268, 271 (1981)."

Accordingly, we concluded that the trial court's refusal in that case to address the merits of the pretrial motion *in limine* did not preserve for review the issues raised in the motion.

Although *Owen* arose in the context of a criminal prosecution, our discussion in that case of motions *in limine* fully applies to civil suits such as the one before us. In *Owen*, we explained that pretrial motions *in limine* are treated as interlocutory because the trial court is asked to address an evidentiary issue outside its normal trial context. *Owen*, 299 Ill. App. 3d at 822-23, 701 N.E.2d at 1177-78. However, in the present case, we are not really dealing with a motion *in limine*, even though that is what Carolyn called her motion.

■ Carolyn filed her motion on the last day of trial, just before Katholi was expected to testify. Carolyn had completed her case in chief and Katholi was the only remaining witness in the defense case in chief. A motion filed under those circumstances simply does not constitute a motion *in limine*, which is by definition a *pretrial* motion. *Owen*, 299 Ill. App. 3d at 821-22, 701 N.E.2d at 1177-78; Black's Law Dictionary 1013 (6th ed. 1990). Thus, Carolyn's motion should more properly be called a motion to bar, and the mere fact that she labeled it a motion *in limine* does not change its essential nature or subject Carolyn to rules of procedure that apply only to pretrial motions.

■ We recognize that occasionally litigants will file a motion to bar evidence after the deadline for pretrial motions but before that stage of the trial when the evidentiary context for the motion has fully developed. In such situations, the trial court may decide to address the motion on its merits if the court concludes (in its discretion) that doing so would be appropriate. However, we doubt that courts will often so conclude because such motions will have all the disadvantages of a motion *in limine* that we discussed in *Owen* (namely, the trial court

will be asked to address an evidentiary issue outside of its normal context) without the advantages that a pretrial motion *in limine* offers—namely, savings of time and judicial efficiency. *Owen*, 299 Ill. App. 3d at 824, 701 N.E.2d at 1179.

Eventually, however, the full context of the evidentiary issue will develop at trial, and a motion calling the issue to the trial court's attention at that time no longer presents the risk of an erroneous ruling that a pretrial motion *in limine* presents. Accordingly, any ruling on the merits of such a motion (which should properly be designated a motion to bar) is *not* interlocutory in nature, and the unsuccessful movant need not object to preserve the issue for review. When, as here, the evidence at issue is presented within minutes of the trial court's ruling, requiring another objection to preserve the issue would make no sense.

Carolyn filed her motion to bar after she had already completed her case in chief and Katholi was the only remaining witness for the defense. The trial court ruled upon the merits of the motion, and then the parties discussed a few minor matters outside the jury's presence. When the jury returned, Katholi called one of his previous witnesses to briefly explain a notation contained in one of the exhibits. Immediately afterward, Katholi took the stand.

Carolyn moved to bar Katholi's opinion testimony after the evidentiary context had fully developed. The trial court denied the motion on its merits, thereby preserving the issue for review. Accordingly, we now turn to the merits of the motion.

### 2. Katholi's Failure To Disclose Pursuant to Rule 213

Prior to 1996, Supreme Court Rule 220 governed the disclosure of expert witnesses (134 Ill. 2d R. 220, repealed by order of June 1, 1995 (see Official Reports Advance Sheet No. 20 (September 27, 1995))). The purposes behind that rule were similar to the purposes behind Rules 213(g) and (i)—namely, elimination of surprise, expediting trial preparation, and improving discovery procedures. However, Rule 220 became mired in exceptions, which provided fertile ground for parties and their attorneys to engage in exactly the sort of gamesmanship that the rule was intended to eliminate. As a consequence, an unnecessarily complex body of case law developed concerning Rule 220. See generally *Yamnitz v. William J. Diestelhorst Co.*, 251 Ill. App. 3d 244, 255-56, 621 N.E.2d 1046, 1053-54 (1993) (Steigmann, P.J., concurring) (suggesting the repeal of Rule 220).

Eventually, Rule 220 collapsed of its own weight, and in 1995 the supreme court repealed it and amended Rules 213 (dealing with writ-

ten interrogatories) and 218 (dealing with pretrial conferences and orders) to address opinion witnesses. 166 Ill. 2d Rs. 213(g), (i), 218. The supreme court's order repealing Rule 220 provided that the new discovery rules were to apply to all cases pending on January 1, 1996. Further, the order required trial courts to hold a case management conference, pursuant to the amended Rule 218, before July 1, 1996. 166 Ill. 2d R. 218(a), eff. January 1, 1996. In this case, the trial court entered a case management order in June 1996 and noted in that order that Katholi had completed his disclosure of all opinion testimony pursuant to Rule 213. Heckman was Katholi's only disclosed opinion witness.

By the time of the December 1997 trial in this case, Rule 213 was in its current form and stated, in relevant part, as follows:

"(g) Opinion Witness. An opinion witness is a person who will offer *any opinion testimony*. Upon written interrogatory, the party *must* state:

(i) the subject matter on which the opinion witness is expected to testify;

(ii) the conclusions and opinions of the opinion witness and the bases therefor; and

(iii) the qualifications of the opinion witness;

and provide all reports of the opinion witness.

\*\*\*

(i) Duty to Supplement. A party has a duty to seasonably supplement or amend any prior answer or response whenever new or additional information subsequently becomes known to that party.

If a deposition of an opinion witness is taken, the witness' testimony at trial will be limited to the opinion expressed therein \*\*\*." (Emphasis added.) 177 Ill. 2d R. 213.

In *Department of Transportation v. Crull*, 294 Ill. App. 3d 531, 538-39, 690 N.E.2d 143, 148 (1998), this court noted that Rule 213 "establishes more exacting standards regarding disclosure than did [Rule 220]." Accordingly, we admonished trial courts to "be more reluctant under Rule 213 than they were under former Rule 220(1) to permit the parties to deviate from the strict disclosure requirements, or (2) not to impose severe sanctions when such deviations occur." *Crull*, 294 Ill. App. 3d at 539, 690 N.E.2d at 148; see also *Adami v. Belmonte*, 302 Ill. App. 3d 17, 24, 704 N.E.2d 708, 713 (1998) (following *Crull*).

■ The trial court allowed Katholi's opinion testimony after citing and reading from a provision in Rule 220 that excepted from disclosure any party whose professional malpractice formed the subject matter of the litigation. 134 Ill. 2d R. 220(c)(4), repealed by order of June 1, 1995 (see Official Reports Advance Sheet No. 20 (September 27, 1995)).

However, the whole point of replacing Rule 220 with the amendments to Rule 213 and Rule 218 was to rid Illinois law of the myriad of exceptions under the old rule. Rule 213's *mandatory* disclosure requirement encompasses *all opinion testimony*, including that of a party to the litigation. We therefore conclude that the court abused its discretion by applying an exception to Rule 220 in a case governed by Rule 213.

In so concluding, we note that a surprise opinion presented for the first time at trial (as here) becomes no less a surprise because the witness rendering the opinion happens to be a party. Perhaps this reasoning led the supreme court to reject the "party exception" previously contained in Rule 220(c)(4) when the court promulgated Rule 213. Last, we note that pretrial difficulties typically associated with the disclosure of an opinion witness, such as scheduling and the like, are minimized when the witness to be disclosed is the party himself.

We also reject Katholi's reliance upon the fifth district's opinion in *Renshaw v. Black*, 299 Ill. App. 3d 412, 417, 701 N.E.2d 553, 557 (1998). *Renshaw* involved a legal malpractice suit where the plaintiffs did not disclose any opinion witnesses under Rule 213(g) but instead sought to rely upon the defendant's own *admissions* contained in her discovery deposition. *Renshaw*, 299 Ill. App. 3d at 416, 701 N.E.2d at 556. The *Renshaw* court concluded, "With a defendant professional, the identity and qualifications should not be at issue. A defendant professional should not be heard to argue surprise when confronted by his or her own previously expressed opinions." *Renshaw*, 299 Ill. App. 3d at 417, 701 N.E.2d at 557. *Renshaw*'s holding governs only those situations where a party is confronted with his *own* previously expressed opinion which the other side is offering as an admission by a party opponent. That situation is entirely different than a case in which, as here, a party presents his own undisclosed opinion testimony at trial.

We also reject Katholi's additional contention that he somehow complied with Rule 213(g)'s disclosure requirement because his deposition testimony included a discussion of the possible causes of Kenneth's death. The relevant portions of Katholi's discovery deposition follow:

"Q. [Carolyn's attorney:] Can you make a knowledgeable assumption as to whether [Kenneth's] death was related to his longstanding coronary artery disease?

A. [Katholi:] That certainly would be one, coronary artery disease or heart disease certainly would have been one of the things that could have caused him to pass away suddenly on that day.

Q. At least initially it would be logical to assume that, but you don't know for sure since an autopsy wasn't done?

A. Right ***.

* * *

Q. [I]s [electromechanical dissociation] inconsistent with sudden death or just something that indicates to you that there may be some other cause of death?

A. It suggests, it wouldn't be totally inconsistent but it suggests a number of other explanations that would be more likely to cause that presentation than a sudden electrical arrest.

Q. What would some of those other more likely possibilities be?

A. Okay, rapid exsanguination such as from like a bleeding peptic ulcer or a ruptured aortic aneurysm, acute pulmonary embolism, a massive cerebral hemorrhage, pericardial tamponade, acute asthmatic attack or an aspiration into the vocal cords.

* * *

Q. Is there any other evidence in the records that you can see that would lead you to believe that one of these other possibilities is more likely than another?

A. It would be just speculation."

At trial, Katholi testified as follows:

"Q. [Katholi's attorney:] Dr. Katholi, based upon the records that you reviewed *** after [Kenneth]'s death, *** do you have an opinion on the cause of *** death?

A. After careful review of all the records and testimony I've *** heard here today, one cannot be completely sure because an autopsy was not done, but the portion of the evidence best fits that this gentleman had a catastrophic death due to a complication of his gastroesophageal reflux.

Q. And what's the basis of that, Dr. Katholi?

A. ***

*** [I]n reviewing [Kenneth]'s rhythm strips in the emergency room ***, there were no acute changes on the EKG to suggest that he had *** just had a heart attack; and there was no abnormal heart rhythms like people have with cardiac sudden death where the heart goes into a chaotic irregular rhythm."

Thus, in his deposition, Katholi stated that heart disease could be a cause of death; at trial, he said that the rhythm strips were inconsistent with cardiac sudden death. In his deposition, he gave a list of possible causes of death but specifically declined to conclude that one of those possibilities was more likely than any of the others. At trial, he concluded that complications from Kenneth's apparent gastroesophageal reflux caused his death, with only the caveat that, without an autopsy, "one cannot be completely sure."

Katholi seems to think that because his deposition testimony covered the same basic subject matter as the opinion he gave at trial,

he somehow adequately complied with Rule 213. However, Rule 213(i) specifically limits the opinion given at trial to the opinions disclosed in discovery. In other words, the proper inquiry asks not what questions were posed during the discovery deposition but instead asks what answers the deponent gave to those questions. Here, Katholi gave different answers at trial than he did during his discovery deposition. He nevertheless would like to squeeze his trial testimony within the ambit of his discovery deposition testimony. Carolyn, not surprisingly, contends that Katholi's trial testimony was completely new.

This particular disagreement between the parties seems to be exactly the sort of thing that a proper Rule 213 disclosure would have avoided. Admittedly, the rule does allow a party to skip providing the actual opinion of someone who is disclosed as an opinion witness if those opinions were provided in a discovery deposition. However, a party wishing to proceed along this route does so at his own risk:

> "The opinions expressed in a deposition need not be later specifically identified in Rule 213(g) answers but, upon objection at trial, *the burden is on the proponent of the witness to prove the opinions were provided in deposition* or Rule 213(g) interrogatory." (Emphasis added.) 177 Ill. 2d R. 213.

It follows that any disagreement as to whether the opinions expressed in a deposition and the opinions given at trial are the same must be construed against the proponent of the evidence.

Applying that standard, we have no difficulty concluding that Katholi's testimony at trial was substantially different than his deposition testimony. Katholi therefore cannot rely upon his discovery deposition as a substitute for the requirement of Rule 213(g)(ii), which requires the disclosure of his opinion. 166 Ill. 2d R. 213(g)(ii). In addition, Rule 213(i) does not relieve a party of his obligation to identify which witnesses he intends to call at trial to give opinion testimony. For this reason, even if Katholi had limited his testimony at trial to the opinions he provided during his deposition, he would have nevertheless violated Rule 213(g)(i). 166 Ill. 2d R. 213(g)(i).

Accordingly, we conclude that the trial court abused its discretion by allowing Katholi's opinion testimony even though he did not disclose himself as an opinion witness. Because of the difference in opinion testimony at trial regarding Kenneth's cause of death, we view this improperly admitted testimony as significantly prejudicing Carolyn's case, requiring reversal and remand for a new trial.

## III. CONCLUSION

For the reasons stated, we reverse the trial court's judgment and

remand for further proceedings consistent with the views expressed herein.

Reversed and remanded.

KNECHT, P.J., concurs.

JUSTICE COOK, dissenting:

Former Supreme Court Rule 220(c)(4), effective until January 1, 1996, specifically provided that defendants such as the defendant in this case did not have to disclose themselves as expert witnesses. Does Rule 213(g) change the "party exception" of former Rule 220(c)(4)? Rule 213(g) does not say that it does so. The majority concludes that Rule 213(g) changes the party exception because "the whole point of replacing Rule 220 with the amendments to Rule 213 and Rule 218 was to rid Illinois law of the myriad of exceptions under the old rule." 304 Ill. App. 3d at 379. It is an unusual rule of construction that a new rule, which is silent on an issue, should be read one way because the old rule provided the other way. The majority reads Rule 213(g) not as it is written but as the majority would have written it. Rule 213(g) is not a comprehensive solution designed to replace Rule 220 and to answer every question that might arise regarding opinion witnesses. Instead, the supreme court simply deleted Rule 220, with the option to make future adjustments as the law develops. The more important rule is Rule 218, providing for case management conferences, which gives the circuit court discretion to discuss the disclosure of expert witnesses with the parties and to enter orders controlling the subsequent course of the action. 166 Ill. 2d R. 218.

Rule 213(g) first defines "opinion witness" as "a person who will offer any opinion testimony." 166 Ill. 2d R. 213(g). Rule 213(g) then provides that upon written interrogatory the party must give the opinion witness' (1) subject matter, (2) conclusions and opinions, (3) bases therefor, (4) qualifications, and (5) reports. 166 Ill. 2d R. 213(g). It is clear that Rule 213(g) does away with the former distinction between retained and nonretained experts. It appears that Rule 213(g) does away with any distinction between lay opinions and expert opinions ("conclusions and opinions"). It is not clear that Rule 213(g) expresses a desire to treat a party the same as any other opinion witness. Rule 213(g) does not say that an opinion witness is "any" person who will offer opinion testimony.

There are problems with applying the opinion witness rules to parties. When defendant calls plaintiff as an adverse witness at trial (735 ILCS 5/2—1102 (West 1996)), plaintiff may now object that the

questioning asks for opinion testimony (*e.g.*, "how fast was your car going?," "were you intoxicated?") and that defendant did not disclose what plaintiff's conclusions and opinions would be, or what plaintiff based them on. The same is true when plaintiff calls defendant as an adverse witness. There are special problems in malpractice cases. A defendant may be prevented from testifying in his own medical malpractice case unless he has voluntarily, without any specific questioning by plaintiff, told plaintiff everything plaintiff later decides might be useful. Under the majority's rule, the doctor in the present case is prohibited from testifying on the central issues of this case. The doctor may not testify that he acted properly or that he was not negligent. Should we now strike the doctor's answer to the complaint, in which he made those same denials?

The majority has adopted an absolute rule for compliance with Rule 213(g), which admits of no exceptions and allows no discretion to the trial court. See *Crull*, 294 Ill. App. 3d at 539, 690 N.E.2d at 148 ("Trial courts should be more reluctant under Rule 213 than they were under former Rule 220 (1) to permit the parties to deviate from the strict disclosure requirements, or (2) not to impose severe sanctions when such deviations occur"). The majority's zero-tolerance policy is unrealistic. The purpose of discovery sanctions is not to punish but, rather, to insure a fair discovery and a trial on the merits. Each case presents a unique factual situation that is to be considered in determining whether a sanction is to be imposed. *Sobczak v. Flaska*, 302 Ill. App. 3d 916, 926 (1998); see also *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112, 123, 692 N.E.2d 286, 291 (1998). Trial courts should be encouraged to think about these complicated matters, not penalized when they depart from what the majority sees as an absolute rule.

There is a problem with enforcing strict compliance in this case. Plaintiff did not file Rule 213(g) interrogatories. Plaintiff would respond that he did not have to, that there was a case management conference at which the disclosure of opinion witnesses was discussed, and the answers were filed in response to the order entered at that case management conference. I agree with that argument, but the argument is inconsistent with the majority's strict compliance approach. Plaintiff's interrogatories may be excused, but so may be defendant's answers, when that information is otherwise made available to plaintiff. The circuit court should have discretion in these cases how disclosure may be accomplished and what disclosure is sufficient.

There are dangers with a rule that permits no deviation from what are held to be strict disclosure requirements and requires severe

sanctions when such deviations occur. It is dangerous to always rule against the party making discovery. When the court takes such a one-sided position, some litigants will be more interested in imposing sanctions on their opponent than in obtaining disclosure from him. Plaintiff here knew in advance what defendant's testimony would be, but waited until the last possible moment to bring the issue to the attention of the trial court. Why didn't plaintiff raise this issue at the case management conference? Plaintiff knew at that time that defendant would be offering opinion testimony. The answer is that plaintiff did not want more information about defendant's opinion testimony. Plaintiff wanted to keep defendant from giving any opinion testimony.

A litigant will have no knowledge of the identity of, or the opinions of, an opposing retained expert witness, but a litigant will know who the opposing party is and can and should take the opposing party's deposition. The information listed in Rule 213(g) is designed to allow the opponent to take a thorough deposition of an opinion witness. The deposition, where the opinion witness is subjected to cross-examination, is the great legal engine of truth. What sense does it make, when the opponent has acquired the information covered by Rule 213(g), and has been able to take the deposition of the opinion witness, to prevent the opinion witness from testifying because Rule 213(g) answers to interrogatories were not filed? Why, when we have subjected the opinion to deposition cross-examination, should we go backward and then require the listing of the opinion in an answer to a Rule 213(g) interrogatory? Rule 213(i) indicates that we do not have to go backward:

> "If a deposition of an opinion witness is taken, the witness' testimony at trial will be limited to the opinion expressed therein, in addition to those opinions identified in answers to Rule 213(g) interrogatories.
>
> The opinions expressed in a deposition need not be later specifically identified in Rule 213(g) answers but, upon objection at trial, the burden is on the proponent of the witness to prove the opinions were provided in deposition or Rule 213(g) interrogatory." 177 Ill. 2d R. 213(i).

The majority states that, even if the testimony at trial was limited to the opinion expressed in the deposition, a violation of Rule 213(g) nevertheless occurred, and the testimony was improperly admitted. The majority indicates this is somehow true because of Rule 213(f), which requires an answer disclosing the witnesses who will testify at trial and the subject of their testimony. I assume Rule 213(f) was complied with for Dr. Katholi. It is unusual to take the deposition of an opinion witness who has not been identified in Rule 213(g) answers, but if such a deposition is taken, Rule 213(i) indicates there is no duty to amend the answers to state the opinions given.

Plaintiff argues that such an interpretation of Rule 213(i) will "put the plaintiff's attorney in the impossible position of having to decide whether relevant questions to be asked during a discovery deposition should not be asked because they may allow the deponent to give opinions at trial even though he or she was not previously identified as an opinion witness." Plaintiff's argument reflects a fundamental misunderstanding of the discovery process. The discovery process is designed to give a litigant the opportunity to discover whatever information may be relevant to his case. The discovery process is not designed to give litigants technical arguments by which they can keep evidence from being admitted at trial, when they were in fact afforded a fair opportunity to discover that evidence.

There is more to the waiver argument in this case than whether plaintiff's motion is labeled a motion *in limine* or a motion in bar. During the argument on plaintiff's motion, the trial court asked plaintiff's attorney, "Which statute [(rule)] are we under?" and plaintiff's attorney responded, "I want to say 220 but I'm not sure." The trial court then read Rule 220(c) to the parties, and the language that the opinion of a party could be the subject of disclosure by deposition only. Plaintiff's attorney did not object that some other analysis should be applied. The court asked whether the doctor's deposition had been taken and whether he had testified to his opinions in his deposition. (The deposition had been taken under Rule 220, which required plaintiff to inquire at the deposition regarding defendant's opinions.) Defendant's attorney responded in the affirmative. The court inquired further: "And you're telling me, Mr. Velde, that paragraphs 2 and 4, opinions regarding the cause of Mr. McMath's death and the possible causes of chest pain on February 27th, have been inquired into in the deposition, isn't that correct?" Defendant's attorney again responded in the affirmative. Plaintiff's attorney then responded: "Your honor, I will—I think we'll stipulate he was asked questions about those two issues." The trial court immediately ruled that the doctor could testify to those issues.

Plaintiff waived the issue on which the majority now reverses first by encouraging the trial court to rule under Rule 220, and then by stipulating that the opinions were provided in deposition, which would make them admissible under Rule 213(i) as well. The majority states, "we have no difficulty concluding that Katholi's testimony at trial was substantially different than his deposition testimony." 304 Ill. App. 3d at 381. That decision, however is for the trial court, not for us. (Plaintiff also never objected in the trial court that Katholi's testimony at trial was substantially different from his deposition testimony.) Plaintiff waived this issue in the trial court, and in any event the trial

court's decision that the opinions were provided in deposition was not an abuse of discretion, unless you accept the majority's argument that the trial court had no discretion.

I would affirm the decision of the trial court.